We'll turn to the third and last case on the argument calendar today, USA v. Aaron Granton and Damian Hardy. Mr. White? Go ahead. Good afternoon, Your Honors. May it please the Court, my name is Brendan White. I represent appellant Damian Hardy. Your Honors, this is a very disturbing case in which Mr. Hardy, who indisputably suffers from serious and chronic schizophrenia and was in fact deemed to be incompetent to stand trial for a period of nearly ten years, was ultimately medicated against his will and found competent and put on trial. And the decision to declare Mr. Hardy competent to stand trial was error and the conviction should be vacated as a result. As Your Honors know, in Dusky, the Supreme Court identified two prongs that must be satisfied in order for a defendant to be competent to stand trial. The first one, I submit that neither was satisfied here. The first one, his ability to see things rationally. And the second one, the ability to reasonably understand the proceedings and be able to assist his attorney in his own defense. I submit to you that that clearly was not satisfied here for numerous reasons. The government's own expert witness, Dr. Preston Becht, who was admittedly quite familiar with Mr. Hardy over a period of many years, she herself acknowledged that schizophrenia is a chronic condition that is incurable and acknowledged that he continued to suffer from it. But having schizophrenia does not inherently render one incompetent. That's correct. But many of the manifestations as exhibited here do, I submit, did render... And our standard of review is clearly erroneous. That is correct, Your Honor. And it was clearly erroneous here. Of course, the district court was, of course, entitled to weigh the testimony of the different witnesses as he saw fit. But even the testimony of the government's own witness demonstrated that he was not competent here and that he was unable to assist... The very clear manifestations of the schizophrenia made it impossible for Mr. Hardy to assist in his own defense. Hadn't he been restored to competency by a year of pharmaceutical intervention and he was deemed by the government's expert, based on her own interactions with him over a course of time, her listening to conversations that he was able to carry on, his letters that he wrote to the judge, all of those were the underpinnings of her opinion that he was competent to assist and stand trial. They were, in part, because they showed, and there was some evidence, undoubtedly, that Mr. Hardy's behavior improved, thanks to the medication. He had initially been declared incompetent. His behavior got worse and worse, at which point there was a motion to have him medicated principally, I believe, because he was dangerous to those around him and to protect those around him. That behavior appears to have been ameliorated some, significantly even, by the medication, but it did not affect or substantially ameliorate the delusional beliefs that underlayed his entire approach to everything about this case. As Dr. Preston-Beck acknowledged, he continued to insist that the Supreme Court, and I confess my research was unable to locate the Supreme Court case, but that the Supreme Court had found that his arrest had been illegal, that he should be released immediately, that his case was governed by a concept called ethu law, which again appears not to exist in our law. Why does that make him incapable of assisting his counsel? The defense attorney gets the discovery, sees what the evidence is, and is there any evidence that Mr. Hardy was unable to say, or that he thought it would be good to cooperate with the government, even though the government had no interest in cooperation or whatever? I've had clients think that, and so have you, I'm sure, think that there's some, have some belief that they have a strategy that's better than yours. But is he not, what is the evidence that he couldn't advise the lawyer as to, you know, witnesses to look for, or things like that? Prior counsel's own statements to the court that it was impossible for him to proceed going forward, that Mr. Hardy was absolutely fixated on these apparently baseless and delusional, not only legal beliefs, but factual beliefs as well. He made that clear, and Judge Blanc did not address that part. He focused principally on the fact that yes, he knows his name, he was once belligerent and obstreperous, and at this point he is now more reasonable, and there was plenty of evidence from both experts that that kind of reduced behavioral aspect of the schizophrenia is common with somebody who has been medicated, but it does not address the true problem, the delusions, the thought processes that make it impossible for the defendant to cooperate with his attorney, and to really understand and assist in the case against him. There were, and this is not like a case like several cited by the government, and probably some that we've all seen, where there is some degree of mental illness. This was a BOP doctor who declared him for nearly 10 years to be incapable of going to trial. That seems to cut both ways, right? The same doctor who says he's competent now said he was incompetent during a long period before that. The same judge who found him competent now had found him incompetent before, so that seems to cut against some notion that these people are eager to get him to trial, or don't know what they're doing, or whatever, or unwilling to recognize incompetence when they see it. I do want to point out that there was a new judge who came on board much later in the process, but yes, I do understand your point about the same doctor. At the same time, though, you have to realize... This was Judge Block's first encounter with Mr. Hardy's competence? I cannot be completely certain on the timeline. I'm sure either Mr. Beecher or Mr. Amatruda could correct me on it. I believe this was the first time he had to make a true determination of competency. But ultimately, as to the doctor, what else was she going to say? He's now been medicated for a substantial amount of time, and there was improvement shown. But at the same time, she acknowledged, yes, he still insists there's ethu law. He still is under delusions. There is no way to cure this disorder. And, Your Honor, a man with severe mental illness should not be going to trial. It's simply not right under our system. This may take you back to the history of this case, but... Certainly. What do you propose that we do? What is it that you expect of us if you prevail? Well, he went to trial and was convicted. He never should have gone to trial, and therefore that conviction should be vacated. I cannot predict the future, of course. My take on this lengthy criminal process is it's questionable whether he would ever be capable of going to trial in this case. I'm not a doctor, obviously. But what is the result of the vacator of this sentence? That he is back on the street, as it were? I don't believe so. He obviously was in prison or in a medical facility for 10 years prior to trial. At least immediately he would still have a pending case. He would still have a pending case. He would have to figure out what to do going forward. As I understand it, at some point, and he's now in his 40s, at some point either he would get better or he wouldn't. And if he did, I suppose the justice system would have to figure out what to do at that point. If he didn't and it became clear that he may never, I submit that, again, the justice system would have to figure out whether it makes sense to continue to charge him under those circumstances. Thank you. Thank you, Your Honors. Mr. Beecher. That has to come down for me because I'm not quite as tall as everybody else in this courtroom. Good afternoon, Your Honors. My name is Robert Beecher, and I represent Aaron Grant in 151645 on this consolidated appeal. I wanted to address two of the four issues specifically that we raised in the appellant's brief. The first one is the selection of an anonymous jury. It was fully briefed. We believe it was error to impanel an anonymous jury for a number of reasons, all of which are set forth in the brief. And I want to bring this Court's attention, incidentally, to an on-the-record decision by Judge Edgardo Ramos in the Southern District in the United States against Ahmed Mohamed El Gamal. On January 9, 2017, the government requested an anonymous jury, and Judge Ramos made it very clear that anonymous juries are to be selected only in the most essentially onerous of circumstances. The danger for prejudice is obvious, and that's why we have in this circuit, we have a three-pronged test. And I will remind Your Honors what the three-pronged test is, but it is in our brief at page 45. This circuit has set forth three factors that a district court should examine. Number one, whether the charges against the defendant are serious. Certainly, the charges against Mr. Grant and Mr. Hardy, serious, no question about that. It was originally an authorized death penalty case. Two, whether there is a substantial potential threat of corruption of the judicial process. And three, whether considerable media coverage of the trial is anticipated. Now, it is our position that the second and third factors, prongs of this test, were not met in this case. Even though there was a history of this organization threatening and actually shooting and attempting to kill witnesses in cases involving members of the enterprise or the organization? Well, Your Honor, it should be noted, and this is important, and we reference it in our brief. All of these defendants had been, all of them in the case, had been arrested in either 2004 or 2005. The government had tried three defendants prior to that, as indicated in our papers. Ken Wayne Jones and James Sessoms and Abu Bakr Rahim. All of them went to trial, all of them without an anonymous jury. Mr. Rahim was originally going to be selected as a death penalty defendant. Were any of those other three defendants involved as Mr. Grant was in the plot to shoot Teresa Gregory? Not that I'm aware of. However, I would point out that the trial record makes it clear when Teresa Gregory was examined by myself on cross-examination, she made it very clear that, in fact, although Mr. Grant had gotten into the elevator with her a long, long time ago, because Mr. Grant had been in custody since 2005, so this was not a contemporaneous intimidation, that, indeed, he did not threaten her. He was interested in knowing if she would testify, but he did not threaten her, and she did not take that inquiry as intimidation. She was shot later in the butt, as she describes it, but there's no allegation that this was the result of any attempt to intimidate her. She had already testified. All of these defendants were off the street. Cash Money Brothers was out of business. Mr. Hardy and Mr. Grant were literally the last men standing. So when you panel an anonymous jury under these circumstances, it raises the specter right out of the box that there's something dangerous about these defendants, and that is an inherent prejudice to them. And for all the reasons stated in our brief, we suggest that that was error, and for that reason, amongst the others that we suggest in our briefing, that the conviction should be vacated. The government says that there was someone involved in the case, one of the co-defendants, who posted a video threatening to kill witnesses. You're saying that person was incarcerated at the time of this trial? My recollection would have to be refreshed as to who that individual was. It certainly wasn't Mr. Granton. We know that. Mr. Granton had been in custody since July of 2005. He was the defendant on trial. There is no evidence whatsoever that Mr. Granton was engaged in, attempting to, or had previously attempted during the course of his incarceration to intimidate. You moved for a severance? I'm sorry? You moved for a severance? No, we did not move for a severance. There was evidence, of course, that Mr. Hardy, who by now was perhaps a little bit hors de combat, had been involved in various efforts, even been convicted of witness tampering. He was going to be on this trial also. We did not move for a severance. We had a strategic reason for not doing so. I was just wondering, because you had a joint trial with somebody who, whatever his current mental condition, did have a specific history of intimidating witnesses by violence. Indeed he did. However, there was no evidence going forward since the date of his incarceration, which was actually a year before Mr. Granton. He was arrested in 2004. There was no evidence whatsoever that he was engaged in witness intimidation or had contracted with anybody else to engage in witness intimidation. And then, of course, and I know my time is up, but the notion that this case was going to receive substantial publicity, which might generate intimidation, it just wasn't the case. There were articles in local newspapers. There was some coverage, most of it having to do with the machinations of the mental health issue regarding Mr. Hardy. Wasn't there coverage because Mr. Hardy was dating a well-known? I'm sorry, ma'am? Wasn't he dating an introvert? Yes, that's right. There was quite a bit of coverage about the trial and about the- Exactly. The coverage was basically a People magazine type of a coverage because he was dating, at one time, Little Kim. And he was dating Little Kim so that he could have an entree into the music industry. That led to a host of other issues which didn't concern our trial, although, if my recollection serves, there was some incident at Hot 97 not involving Mr. Granton. Mr. Beecher, where was your client between 2005 and the time he came to trial? He was at the Metropolitan Detention Center in Brooklyn. All that time? The entire period of time. On what theory or on what- Well, he was detained. There was an order of detention entered. The date of his arraignment, we reserved, and then we did not go back to seek any kind of bail because it was abundantly clear that as the case was going to be a potential death penalty case, he was never going to be released. And the letter that was submitted at the time of his arraignment made it pretty clear that his chances of getting any bail were slim to none, and Slim got on that proverbial bus and left town. So he had this pretrial detention of over a decade. Yes, that's correct. And there's no evidence at all during that time that he had reached out to anybody at all in an effort to intimidate a witness or a potential witness, anybody. Okay. Thank you. You've each reserved a little bit of time. Okay. We'll hear from Mr. Amatruda. May it please the Court, my name is Matthew Amatruda. I represent the United States, and I was part of the trial team below in this case. Just to directly address the issues that counsel addressed here, first of all, with respect to competency, Judge Block's decision was not clear error. He was presented with competing views, competing conclusions drawn by experts from the facts, and he was called upon to make a ruling based on those competing conclusions, and that's precisely the type of situation that the law envisions and that the law requires deference to the judge in that matter. Just to answer Judge Lentz's question, I had a chance to look at this circuit's opinion related to when Mr. Hardy was forcibly medicated that has an excellent procedural history of what happened below up to the point of the forcible medication, and Judge Block did not rule on Mr. Hardy's competency anew after Judge Trager passed away. I think all sides agreed that at that time Mr. Hardy was not competent. What he did was renew the hearing and renew his request to the experts to evaluate Mr. Hardy as to whether he should be forcibly medicated. That happened, I believe, in 2011, and the point being there that Judge Block oversaw these proceedings for nearly four years leading up to the trial. He had extensive experience with Mr. Hardy. He had extensive experience with all of the experts in this case, including the defense expert and the government's Bureau of Prisons expert. Given all of those circumstances, Judge Block's conclusion was not clear error. With respect to the anonymous jury, we submit it was not an abuse of discretion. This gang, when it operated, was really, while not the same as an organized crime sort of situation, it was quite similar in that the entire gang operated to subvert the judicial process when their members were threatened. Again, to answer Judge Lynch's question, the individual, I can't remember, it was either Carl Davis or James Farrier who appeared on YouTube. He had actually, because of the length of these proceedings, been convicted, served his sentence, and released prior to the trial. He was on YouTube ranting about one of the cooperating witnesses in the government's case, the cooperating witness's family. He indicated that he walked around with a gun and was ready to deal with his situation extrajudicially. So that was a very specific threat, in addition to the other factors that led Judge Block to conclude that an anonymous jury was appropriate. So we would submit that that was not an abuse of discretion. Why was Granton not tried separately in earlier? I'm just curious. It doesn't have a lot to do with the merits, ultimately. Understood, Your Honor. First of all, from the government's perspective, a joint trial was much more efficient, and we obviously did not want to try them both separately. And Mr. Granton had not objected while those proceedings were going on. So he never sought a severance and never made any speedy trial noises in all this time? None at all, Your Honor. And I guess I would just add, in terms of speaking of defense objections, one thing I think is important with the Hardy competence determination that I would like to mention is that throughout the trial itself, there were never any issues with Mr. Hardy, whereas before he had been quite disruptive in court and made threats to the judges and done a lot of things to disturb the proceedings. There was none of that. And in addition, his own counsel during the trial actually did not raise any issue as to inability to communicate with Mr. Hardy. I mean, it didn't come up at all, so counsel didn't make an affirmative representation that this situation was fixed, but he also didn't raise the issue that there were problems in preparing to cross-examine witnesses or for Mr. Hardy to participate in his defense. It didn't come up at all before Judge Block? I mean, it came up in the competency proceedings during the trial. Afterwards, there was never a renewed I can't deal with this kind of objection from defense witnesses? That's all I'm saying, yes. And when did the I can't deal with this argument surface? It was just prior to trial. There was a motion in March of 2015, and I believe the trial was in June, if memory serves. So it came up just prior to trial. Although counsel had asked for, had done, started competency evaluations in the months before that. Did Judge Block rely on the representations of Hardy's trial counsel that he couldn't deal with it? I don't think Judge Block specifically made reference to it. He wasn't a witness, right? That's true, Your Honor. I think, in fairness, he was an officer of the court making representations. But you're right, he was not an actual witness who testified. Thank you so much. All right. Mr. White and Mr. Beecher each have one minute each. Thank you, Your Honor. Just very briefly, on the subject of what happened during trial, at that point, we all know, your hands are pretty full. There's no question that Mr. Hardy's behavior was being modified by the medication. Everybody agreed to that. Some of the descriptions of his behavior prior to medication make it pretty clear that, yes, there were reasons why he needed to be controlled. But, again, that doesn't go to the question of whether his mind was actually there. And the representations by trial counsel were made immediately before trial, at which point he's well into the preparation of the case. Mr. Hardy was obviously incarcerated during trial, and it's not as though they were spending a lot of time together. He was under medication. I don't know how mentally present he was, although he was physically present and apparently not disruptive. But I nevertheless maintain that his mind was not there, and therefore his ability to contribute to his own defense was not there. Thank you, Your Honors. I must be an innocent in these matters, but I wonder what exactly is the difference here as to what is going to happen to Mr. Hardy. That is why I should have asked that of Mr. Amatruda, of course, as to what is achieved exactly by convicting him under the criminal law rather than simply confining him as he has been confined. Is it a matter of different menu, different facility? What is it? I don't know, Your Honor. Mr. Amatruda, I'll ask him today. Of course, I'll happily defer to him. All right, just a quick question. Sure, Judge. Why does the government care? Well, because if the criminal proceedings ended, Mr. Hardy would then go into a civil commitment proceeding, which if, and I'll confess I don't understand that thoroughly. He had effectively been under confinement civilly for how many years, 10 years plus? Ten years, Your Honor. And if he had not been medicated, he would have continued there. Well, he would have left. Again, if there weren't criminal proceedings, he would go into the civil commitment world. I'm not certain of what would happen, but I believe there's a possibility that with treatment he would no longer be a danger to society, in which case I think he could be released. I could be wrong. If he were released at some point five years down the road or ten years down the road, the government would be faced with either letting him walk the streets or gearing up a trial that much later after witnesses had died, lost their memories, lost their incentive to cooperate with the government and so on. That's exactly right, Your Honor. Counsel has one minute. You know, when you have one minute, you feel like you're on a treadmill. It's going faster and faster and faster and you can't keep up, so I'll try to get this . . . Reins are very loose here. I would point out that in the Jamal case that I referenced to the court, that was a terrorism case involving connections to Al Qaeda and ISIL, if I recall correctly. So it wasn't a situation, this is regarding the anonymous jury, where it was a run-of-the-mill case, and we cited in our brief the Bresciano case from Indiana, and I urge Your Honors to . . . I'm puzzled as to what we should draw from that. Maybe those judges were wrong, or maybe those judges made perfectly reasonable decisions in their discretion, and this judge in this case made a decision in his discretion, and it's hard enough for us to figure out whether that was a reasonable decision without trying to go into some Al Qaeda case and figure out whether that was the same or different. We've got a record here that we have to contend with, not the record in some Al Qaeda cases. Of course, Your Honor, I understand completely. But some of the cases that we cited, the Bresciano case from Indiana, are exactly on point, precisely the same situation, one with the Latin Kings, where everybody was incarcerated, et cetera. Very, very similar circumstances akin to the ones that we have here, which is exactly why, when this was briefed pretrial, we urged the court not to exercise that discretion, that it would indeed be an abuse of such discretion to unpanel an anonymous jury, given the obvious potential prejudice that it would endure. Thank you very much. We'll take this under submission. We are adjourned. Court is adjourned.